# EXHIBIT B

**Brian W. Steffensen (3092)**
**STEFFENSEN ❖ LAW ❖ OFFICE**
2159 South 700 East, Suite 240
Salt Lake City, Utah 84106
Telephone (801) 485-3707
Facsimile (801) 485-7140
email brian@steffensenlaw.com
Attorneys for Plaintiffs

### IN THE THIRD DISTRICT COURT
### SALT LAKE COUNTY, SALT LAKE CITY DIVISION

| | |
|---|---|
| Linda Coogan and Kenneth Morelli,<br><br>　　　Plaintiffs,<br>vs.<br><br>Joan A. Steed,<br>Frank Joe Steed,<br>Highland Development, Inc.,<br>Duchesne Land LC,<br>　　,<br>　　Defendants. | COMPLAINT AND JURY DEMAND<br><br><br><br>Civil No. 100903145<br><br><br>Judge HIMONAS |

1.　　Linda Coogan and Kenneth Morelli are individuals residing in California ("Coogan/Morelli").

2.　　Joan A. Steed is an individual residing in Duchesne, Utah ("Joan Steed").

3.　　Frank Joe Steed is an individual residing in Duchesne, Utah ("Joe Steed").

4.　　Highland Development, Inc. is a Utah corporation formed by the Steeds to engage in land purchase, development and sale ("Highland Development").

5.     Duchesne Land LC is a Utah limited liability company formed by the Steeds to engage in land purchase, development and sale ("Duchesne Land").

6.     Does 1 - 50 are individuals and/or entities that are liable to the plaintiffs but whose identities are not presently known to the plaintiff ("Other Defendants").

JURISDICTION AND VENUE

7.     The Third Judicial District Court in and for Salt Lake County, State of Utah, has subject matter jurisdiction of the claims asserted below pursuant to the provisions of § 78A-5-102(1), Utah Code.

8.     Defendants are subject to the in personam jurisdiction of the Third Judicial District Court in and for Salt Lake County, State of Utah pursuant to the provisions of § 78B-3-205(1) and (2), Utah Code, in that the claims alleged below arise from the transaction of business by them within the State of Utah.

9.     The defendants are subject to the in personam jurisdiction of the Third Judicial District Court in and for Salt Lake County, State of Utah, in that they either reside in Salt Lake County or do business and/or litigate in that county.

10.    Venue is properly laid before the Third Judicial District Court in and for Salt Lake County, State of Utah, pursuant to the provisions of § 78B-3-307(1)(a), Utah Code, in that the claims asserted below arose in part within Salt Lake County.

11.    In 2004 the Steed Related Defendants represented to Coogan/ Morelli and other members

2

of the public that they had building lots approved, platted and ready for sale and construction in Duchesne County, Utah in two subdivisions known as "Utah Mini-Ranches" and "Duchesne Mini-Ranches.

12.    The Steed Related Defendants also represented to Coogan/ Morelli and other members of the public that they would not only sell these lots, but would agree to build cabins or other dwellings thereon for the purchasers at fixed prices and within a specific time frame.

13.    Coogan/Morelli wanted to retire and move from California to Utah to live.

14.    Coogan/Morelli met with the Steed Related Defendants, received the aforementioned promises, representations and warranties, relied upon them, and agreed to purchase a lot and to build a home thereon.

15.    On or about November 20, 2004, Coogan/ Morelli purchased DMR Phase 2 Lot 37 from Highland Development and/or Duchesne Land.  In connection with this lot purchase, the Steed Related Defendants agreed to construct a cabin/ home thereon at a specific guaranteed and agreed upon price, with construction to begin within two years and to be promptly completed.

16.    Coogan/ Morelli paid off the lot purchase on February 14, 2005 via a check for $33,732.38.

17.    The warranty deed for the lot was not delivered to Coogan/ Morelli until July 5, 2006.

18.   Upon information and belief, the lot and subdivision were not properly platted and
recorded at the time that the lot purchase contract was signed and Coogan/ Morelli paid
for the lot.  Consequently, it was an illegal contract.  The Steed Related Defendants knew
this but intentionally concealed this information from Coogan/ Morelli.

19.   Concerned that construction needed to be commenced within the two year period,
Coogan/ Morelli contacted "Connie in accounting" at Highland Development on or about
7/26/06 to attempt to set up an appointed with "Vince," the architect.  Coogan/Morelli
were advised that no new appointments were being taken until at least fall due to the high
volume of houses under and pending construction.

20.   This really concerned Coogan/ Morelli and shared these concerns with Connie, stating
that their 2 year contract period was up in November of 2006.  Connie told Coogan/
Morelli that she would leave a message for "the developer Joan Steed," and that someone
would  get back to Coogan/ Morelli "in a few days."

21.   When no one called them back, Coogan/ Morelli contacted "Kriss," their sales agent at
Highland Development and/or Duchesne Land, on or about 8/3/06, advising Kriss of the
situation and that they had not heard back from anyone at Highland Development or
Duchesne Land after the 7/26 phone conversation. She said that she would make contact
with Joan Steed and if Coogan/ Morelli hadn't heard from her by the time they arrived on
vacation in Duchesne, Utah (scheduled for  8/19/06 — 8/26/06), that Coogan/ Morelli

could meet with Joan Steed and Kriss in person then.

22. Coogan/ Morelli arrived for their 8/19-8/26/06 vacation in Utah and had several conversations with Kriss.  Kriss informed Coogan/ Morelli in these calls that appointments with the architect were not going to be taken until sometime after the first of the next year — either in January or February 2007.

23. Coogan/ Morelli met with Joan Steed briefly.  Ms. Steed promised them that she would send out letters of extension sometime the following week.

24. Coogan/ Morelli sent a letter to Joan Steed on or about 10/4/2006 complaining that the promised "letter of extension" had not been received.

25. A "Letter of extension" was finally received on or about 10/10/06, from Joan Steed.

26. Coogan/ Morelli called the Steed Related Defendants in February 2007 and was not able to set up an appointment with the architect until sometime in April 22, 2007.

27. Coogan/ Morelli met with Timothy Snyder, "the architect,"  in April of 2007 to go over their ideas for the construction that they wanted.

28. Snyder drew up some plans dated 4/21/07 and a settlement sheet, dated 4/22/07 (addendum to sales contract dated 11/20/04) was signed and  $17,467.60 was paid to the Steed Related Defendants as a 20% down payment toward the agreed upon construction cost of $52,417.60.

29. In these meetings, Coogan/ Morelli inquired about an RV garage either attached or

5

detached.   Coogan/ Morelli owned an RV and needed a place to protect it and store it. Coogan/ Morelli were advised that this would have to be checked into.

30.   In these meetings, the Steed Related Defendants promised, represented and warranted that construction on their cabin/ home would be done over the Fall 2007/ Winter 2008 season.

31.   In reasonable reliance upon these representations and promises, Coogan/ Morelli made the aforementioned "down payment" toward the construction costs.

32.   Upon the recommendation of Joan Steed, Coogan/ Morelli contacted VJ Petitt with Risk Managers Inc/RMI Mortgage Services to start the process of getting a construction loan. Coogan/ Morelli did so immediately, and a credit check was done in order to obtain a "pre-approval" for the loan in May 2007.

33.   On or about October 24, 2007, Coogan/ Morelli received a letter from VJ Petitt which represented and warranted that a building permit was very close to being issued.  Ms. Petitt also indicated that an appraisal had to be ordered to put the construction loan in place and a fee of $450 needed to be paid for this appraisal.

34.   On or about October 29, 2007, Coogan/ Morelli mailed  a check for $450.00 to VJ Petitt for the appraisal.

35.   On or about November 30, 2007, Coogan/ Morelli were sent preliminary paperwork from First American Title, with Adam Moore identified as the escrow officer.   Coogan/ Morelli promptly signed and returned these documents to First American as requested.

6

36.  Believing that construction on the Cabin/ Home was set to begin at any moment, and in reliance on the promises, representations and warranties previously made by the Steed Related Defendants as identified above, Coogan/ Morelli sold their home in La Crescenta in November 2007.  Household items were put into storage in Utah and Ken Morelli's work tools were stored in California.

37.  After selling their California home, Coogan/ Morelli moved into their  motor home for what they believed would be a short interval until the Duchesne cabin/ home was completed and ready for occupancy.  Coogan/ Morelli were forced to begin paying monthly rent for an RV site in California and monthly rental fees to Public Storage in Utah and California.

38.  On or about December 3, 2007, VJ Petitt notified Coogan/ Morelli by e-mail that the appraisal had come in at $265,000.00.

39.  Contrary to their promises, representations and warranties, the Steed Related Defendants did not begin construction on the Coogan/ Morelli cabin/ home over the winter of 2007/2008 – using "severe weather" as the ostensible excuse.

40.  Upon information and belief, the real reason that construction did not begin is that the Steed Related Defendants had not complied with all the legal requirements to subdivide the lots and/or to begin pulling building permits, and/or to pull the specific building permit for the Coogan/ Morelli cabin/ home.

7

41.   Coogan/ Morelli were not told that the building permit was not or could not then be pulled.  These were material facts that the Steed Related Defendants had a duty to disclose to Coogan/ Morelli.

42.   The Steed Related Defendants did not pull the building permit so that construction could begin on the Coogan/ Morelli cabin/ home as soon as the weather improved.

43.   When Coogan/ Morelli contacted the Steed Related Defendants by phone in the spring of 2008 to inquire as to what was going on, the Steed Related Defendants promised, represented and warranted that the cabin/ home would be constructed in the Summer of 2008.  Coogan/ Morelli were not told that the Steed Related Defendants had not completed all of the requirements necessary to obtain a building permit for said construction.  The Steed Related Defendants knew that construction would not commence in the Summer of 2008 on the Coogan/ Morelli cabin/ home.  This was material information that the Steed Related Defendants had a duty to disclose to Coogan/ Morelli.

44.   During an annual trip to Duchesne in June 2008, Coogan/ Morelli were able to meet with "David," the new Highland Development architect.  They went over their plans with David decided to have the garage increased from a 2 to a 3 car garage.  Coogan/ Morelli again inquired about the feasibility of an RV garage.  David said that he would have to check into that – which was the exact same thing that was told to Coogan/ Morelli the previous year by the previous Highland Development architect in April of 2007.

8

45.    David re-drew the plans to include a 3 car garage.  These new plans were dated 6/20/08. Coogan/ Morelli preliminarily approved the new drawing, with final approval pending receipt and approval of the cost estimates.  Coogan/ Morelli paid $500.00 for "plan revision/garage."

46.    David then told Coogan/ Morelli that he had reviewed the original plans drawn by Timothy Snyder and said that the plans would have to be re-drawn prior to applying for a building permit.

47.    Coogan/ Morelli were really shocked and surprised by this disclosure that the building permit still needed to be "applied for."   Coogan/ Morelli had been told the previous October (2007) that at the building permit was close to being issued.  Obviously the Steed Related Defendants had misrepresented the facts about the building permit the prior year.

48.    The architect David also told Coogan/ Morelli that once the plans were re--drawn he would send them a copy to review and approve.

49.    Coogan/ Morelli also talked to Joe Steed during this Summer 2008 visit.  Joe Steed claimed that there had been complications and delays related to the septic system and bringing water and electric power up to the end of the cul-de-sac where the Coogan/ Morelli lot is located; but Joe Steed promised, represented and warranted at the end of his meeting with Coogan/ Morelli that construction on their cabin/ home would begin within one to two months.  These statements were knowingly false when made, and Steed failed

to disclose the truth as to the condition of the development and problems with getting

approvals from Duchesne County necessary to complete improvements and obtain

building permits.

50.     After the June 2008 meetings, Coogan/ Morelli made numerous attempts during the July

2008 through Oct 2008 time period to followup on the promises, representations and

warranties.  The Steed Related Defendants failed to (a) provide any updates on the

progress being made, (b) prepare and produce the cost estimate sheet on the larger three

car garage, ( c) forward on the supposedly necessary re-drawn house plans.   Coogan/

Morelli left numerous messages.  Most phone calls were not returned.  When Coogan/

Morelli did talk to someone, it was claimed that things had been faxed to Ken Morelli's

work.  Morelli check and most of these claims were false – i.e., nothing had been faxed;

and when something finally was faxed, it was an incorrect set of house plans.   Vague

excuses were also being made about ongoing problems with the septic systems and with

getting the health department out for inspections.

51.     On or about October 20, 2008, Coogan/ Morelli sent a letter to Joan Steed which

provided a brief synopsis plaintiffs' ongoing problems with getting the cabin/ home built.

Steed was told that Coogan/ Morelli still had not received the re-drawn plans that needed

to be approved, still had not received the cost estimate on the larger three car garage, and

still had not received any word about the feasibility of having an RV garage.  Steed was

also notified that the contract period for "option to build" was due to expire on December 20, 2008.  Coogan/ Morelli again suggested that Highland Development should under the circumstances extent that time period if it is unable to start and complete the construction as promised, represented and warranted.

52.   On or about October 29, 2008, Joan Steed called and left a message on Linda Coogan's cell phone claiming that the new architect "David" had supposedly been attempting to contact Coogan.  Steed asked Coogan to callback and advise as to the best way she could be reached. These claims were absolutely false.  I checked my phone logs and there were no message or missed calls from David.

53.   On or about October 30, 2008, Coogan called and was able to talk to Joan Steed. Coogan told Steed that Coogan had received no missed calls or messages from David and inquired as to how Steed had no trouble calling and leaving a message but that David supposedly could not.  Steed had no explanation and was clearly uncomfortable at having been caught in this lie.

54.   Steed promised, represented and warranted to Coogan that David would call Coogan and give all of the required/ desired updates as to the status of the Coogan/ Morelli project. Steed claimed that she herself could not provide this information because she supposedly did not have access to my file.  Steed further promised, represented and warranted to Coogan that Highland Development and Duchesne Land were moving forward with our

11

project and that our house was on their current build list to begin construction very soon.

55. Steed specifically failed to disclose to Coogan that there were serious problems between the Steed Related Entities and Duchesne County which were making it impossible for any construction to begin on the Coogan/ Morelli cabin/ home within the time frames being promised.

56. On or about November 1, 2008, Joan Steed called Coogan and apologized for the fact that David had not called Coogan on October 31, 2008 as Steed had promised that he would. Steed told Coogan that Steed was personally going over the current building files and would contact David about the status of our re-drawn plans, the garage enlargement and the possible RV garage.

57. Coogan and Steed had a brief discussion about the financing market.  Steed further promised, represented and warranted to Coogan that all necessary paper work would be completed and mailed out to Coogan for signing the next week.   Steed also represented and warranted to Coogan that site assessment from the Health Dept. on waste lines would be done the next week, that it would take another 2-3 weeks after that to receive Health Department approval for the waste lines, and then the building permit could be approved and ground broken to start construction.

58. This was the first time that Steed had advised Coogan expressly that the building permit approval process had been held up for lack of inspections on the sewer system.

Obviously the representation the prior year that building permits were close to be issued had been a lie.

59.  Joan Steed further promised, represented and warranted that all of this would be accomplished within a month to a month and a half at the most, and that they would have the cabin/ house framed and ready for interior work before the winter weather hit.

60.  Joan Steed inquired about Coogan/ Morelli's plans and promised, represented and warranted that the cabin/ house would be started and completed without any problem before our anticipated move to Utah in April to June of 2009.

61.  On or about November 10, 2008, Coogan called Highland Development and left a message for Joan Steed.

62.  Steed finally returned the call on or about November 14, 2008.  Steed told Coogan that Steed had two different sets of plans for the cabin/ house in Steed's file and said that she needed to verify which were the correct plans.  Steed asked Coogan to send Steed a copy of our plans along with our copy of the associated cost settlement sheet.  Upon information and belief, these claims by Steed were false, and she needed these documents from Coogan/ Morelli because Highland Development had lost them.

63.  Coogan sent the documents by overnight mail to Joan Steed on 11/17/08.  Steed received them on 11/18/08.  The documents were accompanied by a cover letter stating that Coogan/ Morelli were still waiting to receive a cost estimate for the three car garage

13

expansion and word about the feasibility of an RV garage.  The cover letter also raised the issue of the "option to build" time period.   Finally, the letter contained a "wish list" of issues which needed to be discussed relating to utilities, appliances, and possible upgrades.

64.   When no response had been received from any of the Steed Related Entities, on or about December 2, 2008 Coogan called Joan Steed to inquire as to the status of things.  Coogan left a message for the architect David or Joan to call back.

65.   When no response had been received from any of the Steed Related Entities, on or about December 10, 2008 Coogan called Highland Development and left another message for the architect David or Joan to call back.

66.   This time David did call back.  David represented and warranted that "everything is a go," "everything is proceeding nicely," and that they were planning on pulling the building permit for the cabin/ house on 12/15/08 and breaking ground shortly thereafter.

67.   David also went over the "wish list" with Coogan and said that he would talk to Ken Morelli at a later time regarding technical things relating to the CC&R's and how an RV garage must be attached.  Coogan told David that Coogan/ Morelli still hadn't received the pricing on the garage expansion.  David said that he had sent the drawing and information to the Highland Development office and that a cost sheet should have been sent out to Coogan/ Morelli for approval. David promised to check on this and make sure

14

it was sent to us immediately.

68.     While Coogan was on the phone with David, Morelli called from his work and was also able to talk to David.  Morelli also went over the wish list with David, touching mainly on technical things and also went over the three car garage size and the RV garage size and plan. David also represented and warranted to Morelli that the building permit would be pulled on 12/15/08 and they would break ground on construction on 12/17/08.

69.     Morelli also complained to David that Coogan/ Morelli still had not received the cost estimate on the garage expansion and that the supposed "option to build contract period" was up as of 12/20.

70.     David reassured Morelli that there would be no problem as long as the building permit was pulled before the end of the "contract period."

71.     David also stated that he would fax a copy of the complete revised plans along with cost estimates to Morelli at his work fax number on 12/12/08 so that Morelli and Coogan could review them, sign them, and fax them back.

72.     Coogan/ Morelli did not receive a fax on December 12, 2008 as promised by David.

73.     Coogan/ Morelli did not receive a fax on December 13, 2008.  Consequently, Coogan called and left message for David stating that the revised plans and cost estimates had not been received.

74.     On or about December 15, 2008, David called Morelli and apologized for not getting in

touch sooner.  David claimed to have been unable to fax the plans because they were "too

large."  David promised to send them by overnight mail "tomorrow" 12/16 so as to be

received the next day on 12/17/08.

75.    On or about December 17, 2008, plans arrived by FedEx at Morelli's work address.   The

House plans for the main floor and loft were dated 7/16/08; those for the basement were

dated 7/18/08, and those for the garage/RV garage combo were dated 12/11/08.  There

was still no cost sheet included for the revised garage and RV garage.

76.    On or about December 19, 2008, Morelli called David on David's cell phone and left

message for David to call Morelli.  Morelli indicated that the plans appeared to be okay

except for a few questions and additions.

77.    On December 20, 2008, the extension on the supposed "option to build" time period

expired.

78.    On or about December 22, 2008, Coogan called and talked to Joan Steed and left a

message for David to call Morelli. Coogan complained that David had not returned

Morelli's 12/19/08 telephone call and voice mail.

79.    Joan Steed told Coogan that David's cell phone was "not working."  Steed promised,

represented and warranted that she would provide Coogan/ Morelli with a final cost sheet

and that this same information would be sent to VJ (Highland Developments' financing

person).  Steed told Coogan to contact VJ after the Christmas holidays to work on the

16

construction loan.

80.     Morelli and David also made contact with each other shortly thereafter.  Morelli

discussed the few additions/changes to plans and also inquired into adding a workshop to

the back side of the RV garage. David promised and agreed to revise the drawing

showing the workshop and to revise the cost sheets accordingly "within be a few days."

81.     On or about January 6, 2009, Coogan called Highland for an update.  Neither David nor

Joan Steed were available, so Coogan left a  message to have them call back with an

update.

82.     On or about January 9, 2009, Joan Steed returned Coogan's phone call, but claimed not to

have the Coogan/ Morelli file and promised that she would have David call Coogan or

Morelli "tomorrow" as to the status.  She also promised to get cost sheets to out to

Coogan/ Morelli so that they could review and approve them and then able to get started

with the construction loan process.

83.     On or about January 10, 2009, David called Coogan/ Morelli and advised told them that

he would send the plan drawing with workshop included and the cost sheet for the

Garage/RV Garage/Workshop addition by overnight mail for their review and approval,

along with another copy of the complete house plans for their records, and that all of this

would be mailed out on 1/12/09 so that it would be received by Coogan/ Morelli by

1/13/09.

17

84.    On or about January 14, 2009, Coogan/ Morelli received (a) the revised plans (garage/RV garage/workshop dated 12/18/08), (b) a complete copy of the house plans and ( c) a cost sheet.

85.    Coogan/ Morelli reviewed the plans and cost sheet, but noted thereon that there was a mistake with respect to the garage modification (There had not been a proper credit for the garage area already included in the cost settlement sheet dated 4/22/07 and previously approved).  Coogan/ Morelli drafted a cover letter (dated 1/20/09) to be included with the signed plans and cost sheet which raised some questions on some previously discussed matters, identified some minor changes to the workshop/RV garage and which asked some questions regarding the workshop/RV Garage.

86.    Coogan/ Morelli sent the cover letter and signed plans and cost sheet back to Highland on or about January 21, 2009.  Coogan/ Morelli also sent in this package a check to Highland Development for $10,457.20, for the 20% down payment on the RV garage and workshop area portion of the construction agreement (a down payment toward construction of the rest of the cabin/ home had previously been sent as set forth above).   The package arrived and was delivered in Duchesne on January 22, 2009.  Coogan/ Morelli's check was deposited in Highland Development's account on January 26, 2009 and subsequently cleared Coogan/ Morelli's bank on January 27, 2009..

87.    On or about February 3, 2009, Coogan called Highland Development for an update and

18

talked to a "Kriss." Kriss said that David was out in the field and Joan Steed was out but due back the next day. Kriss said that someone would call back with an update. Kriss further stated that she was surprised David hadn't called Coogan previously because Kriss said that she had informed David the previous week that Highland Development had received Coogan/ Morelli's package with the approvals and check for the rest of the construction down payment.

88.    On or about February 6, 2009, Kriss called and left message on Coogan's voice mail stating that Highland Development had not forgotten about Coogan/ Morelli, but that Joan Steed had been extremely busy and that Steed would call Coogan the next day, Saturday. Kriss' message also stated that if Coogan/ Morelli did not get a call from Steed, to call Highland Development back.

89.    When Joan Steed did not call as had been promised, Coogan called Highland Development on or about February 9, 2009. Coogan talked to Kriss. Kriss told Coogan that Kriss did not work on Saturdays but that she was sure that Joan Steed wanted to talk to Coogan about the "next steps in the process." Kriss promised that she would give Coogan's message to Steed again. Kriss also said that Steed was then out of town but due back the next day or the day after. Coogan asked Kriss if Kriss knew if the building permit had been pulled as promised, but she said that she didn't know.

90.    On or about February 17, 2009, Coogan called Highland Development for an update

19

because no one had returned her calls.  She left another message for David and Joan Steed.

91. On or about February 19, 2009, Joan Steed called Coogan.  Steed told Coogan that "loan information" regarding Coogan/ Morelli had been faxed to VJ approximately 2 weeks prior thereto (which information consisted of the cost settlement sheet dated 4/22/07, plus the approved additional cost estimate dated 1/20/09).  Coogan asked Steed why no one had called Coogan to tell her about that.

92. Coogan asked Steed if the building permit had been pulled as previously represented. Steed said no, but that they were ready to pull it.  Steed said they were still waiting on final site inspection by the health department.  Steed said that she was having the architect David follow up on this with a faxed letter plus a certified return receipt letter to the health department.

93. Steed told Coogan to telephone VJ the next Tuesday because Steed thought that VJ was out of town at that time and was also usually too busy on Mondays, to start the construction loan process.  Coogan complained about having to start the construction loan process again.  Coogan complained about Highland not being ready to start the construction in a timely fashion.   Steed assured Coogan that Highland was ready to start as soon as the health department clearance was obtained and that the Coogan/ Morelli cabin/ home was at the top of build list.

20

94.    Steed also told Coogan that Steed was going to be out of town until 3/5/09 and if VJ

needed any paperwork that Coogan was to have VJ call Steed's office.   Coogan ended

the conversation with Steed by asking Steed to confirm that Highland Development

agreed with Coogan's figures on the revised cost estimate sheet which Coogan had sent

in.  Steed said yes, and that it was this revised cost estimate sheet that Highland had

forwarded to VJ.

95.    On or about February 19, 2009, Coogan e-mailed VJ and stated that Coogan/ Morelli

were ready to once again start our construction loan process.

96.    On or about February 20, 2009, VJ e-mailed back in response that a new loan application

would be needed and that VJ would mail a new packet out to Coogan.

97.    On or about February 25, 2009, VJ e-mailed Coogan stating that VJ had sent the loan

application packet out the previous day.

98.    On or about March 5, 2009, Coogan mailed the completed package back to VJ.   Coogan

thought it was strange that when Coogan received the loan application packet from VJ,

the cover letter which accompanied it stated that the construction loan amount had been

left blank because VJ said that she did not know how much would be necessary to

complete the construction.  This makes it clear that Joan Steed had not told the truth when

she told Coogan that all of the "cost sheets" for the project had been forwarded to VJ

some weeks prior thereto.

21

99.   VJ received the package on or about March 6, 2009.

100.   Coogan telephoned Highland Development on or about March 18, 2009, in order to learn

whether construction on the house had commenced.  Coogan left a message for David or

Joan Steed to call Coogan back.  David called back and left message on Coogan's

voicemail stating that Highland Development had of the all permits in place and that

David was glad that Coogan had called because in order for Highland Development to

proceed with the construction, Highland needed evidence that a construction loan

commitment was in place and that an appropriate deed of trust had been signed.

101.   This struck Coogan/ Morelli as being very odd.  Why had Coogan/ Morelli been

promised/told so many times that Highland Development was ready to start construction

on the cabin/ house when in fact Highland Development apparently never could have

been ready to start construction at those times because (a) they at all times did not in fact

have a building permit in place, and (b) if they needed the construction financing in place

first, the construction financing had not even been applied for.

102.   Coogan/ Morelli did not know that the building permit process was being held up by a

Health Department issue until sometime after 2/19/09 when Steed told Coogan that

Highland was still waiting for clearance from the health department.

103.   Coogan/ Morelli did not know that construction could not actually begin until the

construction financing was completed and in place until David informed Coogan of this

fact on or about March 18, 2009.

104. Coogan called David after receiving this voice mail.  Coogan told David that Coogan had re- started the construction loan process with VJ and that VJ had received the completed package on 3/6/09.  Coogan told David that Coogan had not heard anything from VJ in the interim.

105. Coogan told David that Coogan/ Morelli still had not received a written confirmation from Joan Steed that the cost sheets as revised were all acceptable (Steed had previously confirmed this verbally) for the Garage/RV Garage/Workshop.  David told Coogan that he would follow up.  David said that he had already started to cut in the driveway but had been told to do no further work until the construction loan was in place and a deed of trust.

106. David also told Coogan that the cabin/ house was going to have to be "tweaked slightly" due to the septic system requirements, but that it would still work out to allow for the "best views."  David asked Coogan if she and Morelli could come up and review the placement of the house prior to the pouring of the concrete for the foundation.  Coogan told David that this would not be a problem as long as Coogan/ Morelli were given a couple of weeks advanced notice.

107. Joan Steed called Coogan and said that Steed would do a whole new settlement sheet to include the garage/RV Garage/Workshop and would start working on "the deed of trust."

23

Steed also promised to contact VJ to make sure VJ had everything she needed – such as the "new settlement sheet."   Coogan thought this was odd because Steed had previously said that VJ had the original settlement sheet plus cost estimate sheet.

108.   On or about March 19, 2009, VJ e-mailed Coogan and informed Coogan that the appraiser Highland Development used for the mini- ranches had told VJ that he didn't feel like he could appraise the cabin/ home for $262,000.00 – even though an appraisal had supposedly previously been done which had come in at this number.  VJ said that Coogan/ Morelli may need to "re-think" what Coogan/ Morelli were going to build on their lot – or wait to build later when the market "comes back around."

109.   On or about March 19, 2009, Coogan e-mailed VJ back asking whether or not the appraiser had given VJ an estimate of what the appraiser thought the appraisal of the completed project would come in at.  Coogan indicated that Coogan/ Morelli might be able to increase their cash contribution toward the construction of the cabin/ home.

110.   On or about March 20, 2009, VJ e-mailed back to Coogan that the appraiser thought "at best" the appraisal would come in somewhere between  $160,000.00 and $170,000.00 because "the market has really crashed out here."

111.   VJ also informed Coogan in this email that the lender which Highland Development had been using to fund the construction loans had decided not to do any more "rural homes." VJ said that Highland Development was searching for another option, but at that time VJ

24

said that they couldn't provide a construction loan at all, because no long term "take out" financing was available for "rural homes."

112.   On or about March 20, 2009, Coogan called and left a message for Joan Steed to call Coogan.  Coogan stated that it was extremely important that Steed return the call, that it concerned the construction loan. Coogan was advised that Steed would be back in the office "in a couple of hours."

113.   When Coogan had not received any return call by March 23, 2009, Coogan placed another call to Highland Development and was able to talk to Joan Steed.  Coogan conveyed her displeasure, frustration, and fear regarding the problems with constructing their cabin/ home.   Steed told Coogan that she was confident that they would be able "to work out a reasonable financial solution" that would give Coogan peace of mind.

114.   Steed apologized for all of the delays.  Steed said that (a) they had been through four (4) project managers, (b) they had had problems getting the health department out to perform required inspections, ( c) they had been forced to put in a large tank before they were allowed to continue the development, and (d) they had had problems with finding and keeping good/qualified construction workers.  Coogan told Steed that while Highland Development may have had problems, that "business is business."   Steed then said she had to go, but would call Coogan right back.

115.   Steed called Coogan back at 5:45 PM and left a message on Coogan's voicemail

25

apologizing for not getting back to Coogan sooner.  Steed said that she would be in the office the following morning to continue the conversation.   Steed further stated she had discussed the matter with her husband and he was in agreement, ready to help out in whatever way was necessary to get the Coogan/ Morelli cabin/ house built.

116.   On or about March 24, 2009, Coogan called Joan Steed back.  Steed reiterated that the Steed Related Defendants would "work everything out."  Steed said that she would work with VJ to check out other financing sources, and she asked Coogan to contact any financing sources which Coogan and/or Morelli might have.  Steed said that in the mean time she would be getting "the deed of trust" done and would get it out to Coogan so that construction could begin as soon as the deed and the construction loan were in place.

117.   Neither VJ, anyone else at Highland Development nor Coogan or Morelli could find any sources of financing for the construction loan.

118.   Due to the delays in accomplishing almost all tasks necessary to complete the development of the subdivision and the lot, the opportunity to finance and construct the cabin/ home which Coogan/ Morelli had contracted with Highland Development and/or Duchesne Land to build had been lost.

119.   Due to breach of contract, breach of the implied covenant of good faith and fair dealing, the illegality of the contract(s), failure of consideration, lack of consideration, fraud and/or misrepresentation, and impossibility of performance, Coogan/ Morelli notified the

Steed Related Defendants that Coogan/ Morelli had decided to terminate and rescind the agreements and lot purchase and demanded the return of all monies which Coogan/ Morelli had paid to Highland Development.

120.   The Steed Related Defendants have refused, and instead claimed that they could fund the construction of the cabin/ home.

121.   However, Joan Steed and Joe Steed have been indicted on multiple felony counts of tax evasion; Joan Steed and Joe Steed have also been indicted on multiple felony counts for fraud and violation of consumer laws relating to the mini ranches business.  For these reasons, and due to a deeply held disbelief that the Steed Related Defendants can and/or will perform as they promise, represent and warrant, Coogan/ Morelli do not believe that they can trust the Steed Related Defendants to "fund" and "construct" their cabin/ home.

122.   Joan Steed, Joe Steed, David, VJ, Kriss, Highland Development, Duchesne Land and Does 1-250 (the "Co-Conspirators") joined together for the common purpose of inducing individuals such as Coogan/ Morelli to (a) purchase building lots, (b) to advance monies and/or borrow monies to construct cabins/ homes on said lots, and  ( c) to enter into agreements to allow the Co-Conspirators to receive monies and/or draw against the construction loans and to construct cabins/ homes on those lots, all based upon false representations and warranties that (d) the lots are fully platted, recorded and saleable, (e) the subdivision improvements are in or will shortly all be completed, such that (f)

27

construction and completion of the cabins/ homes will be done within the near future; and during the process defrauding and cheating Coogan/ Morelli and others (banks, subcontractors, county officials and other regulators) via (aa) inflating the price of the sale of the lots and failing to disclose the same to the purchasers, (bb) failing to disclose all of the facts relating to the condition of the lots and/or the subdivisions, (cc) collecting and sharing via unlawful and/or undisclosed kick backs, real estate brokerage fees, (dd) collecting and sharing via unlawful and/or undisclosed mortgage loan fees, (ee) collecting and sharing via unlawful and/or undisclosed appraisal fees, (ff) inflating appraisals, (gg) making inaccurate and fraudulent construction loan applications, (hh) making inaccurate and fraudulent construction loan draw requests – and thereby drawing monies from loans for work never performed and/or performed incorrectly and/or shoddily without disclosing the same to the buyers, and the like, so as to enrich themselves at the expense of Coogan/ Morelli and others similarly situated, and from any innocent lenders (if their be any such), and from innocent sub contractors.

123.   In order to carry out this scheme to defraud Coogan/ Morelli and/or to obtain property or money from Coogan/ Morelli, from their underlying lenders and from subcontractors through false pretenses, misrepresentation and the like, Joan Steed and Joe Steed, directly or indirectly through the other defendants,  sent directives by mail and/or fax and/or telephone from their corporate offices to various (a) mortgage loan brokers, (b)

appraisers, ( c) in and out of state to potential buyers such as Coogan/ Morelli, (d) in and

out of state potential and actual lenders to the buyers such as Coogan/ Morelli and/or (e)

in and out of state to lenders to the Steeds and/or one of their Co-Conspirator entities.  At

all times, the Steeds and the other Co-Conspirators knew that these and the other actions

complained of herein, were false and fraudulent and intended to defraud Coogan/ Morelli

and other such buyers, and innocent lenders and subcontractors, and/or otherwise obtain

property from Coogan/ Morelli and other such buyers, and innocent lenders and

subcontractors through false pretenses.

124.   The Steeds and the Co-Conspirators communicated via the mails and/or telephone lines

(fax and voice) across state lines in furtherance of their scheme to defraud Coogan/

Morelli and other such buyers, their innocent lenders and subcontractors. This activity

was conducted as part of the Co-Conspirators' knowing and wrongful scheme to defraud

Coogan/ Morelli and other such buyers, their innocent lenders and subcontractors, and/or

to obtain property, services and/or monies from the same through false pretenses,

misrepresentations and the like.   Each separate directive or communication in connection

with this conspiracy to defraud and/or obtain property, services and/or monies from these

entities constituted a separate act of mail and/or wire fraud (18 USC 1341 and 1343)(mail

fraud if the directive was sent by US Mail or private carrier; and wire fraud if the

directive was sent by fax to other states or out of the country).

29

125.    Each and every transfer of monies as directed by any of the Co-Conspirators, as part of or

after these acts of wire and/or mail fraud, and racketeering activity, violated 18 U.S.C.

1956 and 1957 (money laundering).  The stock and/or money obtained from these

wrongful activities and/or then funds transfers constituted the "proceeds" of unlawful

activity (violations of 18 USC 1961 et seq.), and were undertaken with the intent of

carrying on that unlawful racketeering activity; and/or as transactions designed in whole

or in part to conceal or disguise the nature, the location, the source, the ownership and/or

control of the proceeds of the racketeering activity in violation of 18 USC 1956(a)(1)(A)

and (B).  From the reports in the news with respect to the indictments of the Steeds and

others, upon information and belief the Co-Conspirators used many different entities and

accounts, and hundreds if not thousands of transfers in a deliberate attempt to hide the

illegally obtained monies.

126.    Upon information and belief, the Co-Conspirators caused the money obtained from the

fraudulent activity alleged herein to be transported, transmitted and/or transferred either

from within the United States to one or more places outside the United States, and/or

from outside United States to a place within the United States, with the intent to promote

and/or accomplish the aforementioned fraud in violation of 18 USC 1956(a)(2)(A)(money

laundering).

127.    Upon information and belief, the Co-Conspirators caused the money obtained from the

unlawful and fraudulent activity alleged herein to be transported, transmitted and/or

transferred either from within the United States to one or more places outside the United

States, and/or from outside United States to a place within the United States, knowing

that the monetary instrument or funds involved in the transportation, transmission or

transfer represented the proceeds of some form of unlawful activity and knowing that

such transportation, transmission, or transfer was designed in whole or in part to conceal

or disguise the nature, the location, the source, the ownership, or the control of the

proceeds of the unlawful activity in violation of 18 USC 1956(a)(2)(B)(i)(money

laundering).

128.   Upon information and belief, the Co-Conspirators with intent to promote the scheme or

artifice to defraud Coogan/ Morelli and other such buyers, their lenders and/or

subcontractors, and/or to wrongfully obtain possession of their property, services and/or

the like,  through false pretenses, misrepresentation and the like, and after having utilized

the mails and/or interstate wire transmissions to further said scheme, conducted or

attempted to conduct numerous financial transactions involving property which was the

proceeds of the scheme to defraud Coogan/ Morelli and other such buyers, their lenders

and/or subcontractors in violation of 18 USC 1956(a)(3)(A)(money laundering).

129.   Upon information and belief, the   Co-Conspirators with intent to conceal or disguise the

nature, location, source, ownership, or control of property which they knew or believed

was the proceeds of the aforementioned unlawful activity, conducted or attempted to

conduct  financial transactions involving property which was the proceeds of the scheme

to defraud the Coogan/ Morelli in violation of 18 USC 1956(a)(3)(B)(money laundering).

130.   Upon information and belief, the  Co-Conspirators, acting within the United States and

without the United States but as United States citizens, knowingly engaged and/or

attempted to engage in monetary transactions in criminally derived property of a value

greater than $10,000 which was derived from the aforementioned unlawful activity in

violation of 18 USC 1957 (illegal monetary transactions).

131.    As a result of the scheme to defraud Coogan/ Morelli, Coogan/ Morelli purchased lot(s)

at inflated prices, borrowed monies for the purchase of said lot(s), borrowed monies to

construct homes on said lot(s), and/or paid monies to the Co-Conspirators, to said lenders

and/or to attorneys.  All of these actions were taken in reliance upon the promises and

representations and warranties of the Steeds and/or the other Co-Conspirators.

132.   The Steeds, Highland Development, Duchesne Land and the other Co-Conspirators

breached the terms of their agreements, and acted contrary to their representations and

warranties, with/to Coogan/ Morelli.

133.   Coogan/ Morelli have been damaged as a result of the actions of the Steeds, Highland

Development, Duchesne Land and the other Co-Conspirators in an amount to be

determined at trial, but not less than $500,000.

32

134.    Coogan/ Morelli are entitled to recover punitive damages from The Steeds, Highland

Development, Duchesne Land and the other Co-Conspirators in an amount to be

determined at trial, but not less than $1,500,000.

### First Claim for Relief - Equitable and Declaratory Relief

135.    Coogan/ Morelli reallege and incorporate each and every paragraph in this complaint

herein as if set forth in full.

136.    Coogan/ Morelli are entitled to an order from this Court that the lot purchase and all other

agreements with any of defendants are void as illegal contracts, and unenforceable against them,

and should be rescinded and all monies paid by Coogan/ Morelli be returned forthwith,  and to an

award of their costs and fees.

### Second Claim for Relief – Alter Ego/ Pierce Corporate Veil

137.    Coogan/ Morelli incorporate herein by reference each and every paragraph in this

complaint.

138.    There is such a unity of interest and ownership between The Steeds, Highland

Development, Duchesne Land and their directly affiliated corporate entities among Does 1-250,

and all of the same  have cooperated together and operated the corporate defendants in such a

fashion, including but not limited to the failure to comply with ordinary corporate formalities,

that all of the said corporate defendants are clearly the agents and alter egos of one another.

Further, and/or alternatively, to recognize the corporate forms of the various corporate defendants

33

would countenance and facilitate a fraud and/or inequitable result.  As such, each of the Co-Conspirators, and their separate assets, should be held jointly and severally liable for all of the relief granted to Coogan/ Morelli herein.

### Third Claim for Relief – Breach of Fiduciary Duty

139.    Coogan/ Morelli reallege and incorporate herein by reference all of the paragraphs in this complaint.

140.    The Steeds, Highland Development, Duchesne Land and their directly affiliated entities, assumed the role of fiduciary with respect to Coogan/ Morelli and owed Coogan/ Morelli a fiduciary duty.

141.    The appraisers and loan brokers and all entities affiliated directly with them assumed the role of fiduciary with respect to Coogan/ Morelli and owed Coogan/ Morelli a fiduciary duty.

142.    These entities violated that fiduciary duty via the actions complained of herein.

143.    Coogan/ Morelli are entitled to recover actual damages and punitive damages against each of these entities in amounts to be determined at trial, but not less than $500,000 and $1,500,000 respectively, plus their costs and attorneys fees.

### Fourth Claim for Relief – Unjust Enrichment

144.    Coogan/ Morelli reallege and incorporate herein by reference each and every paragraph in

34

this complaint.

145.    The Co Conspirators have obtained monies directly from or as a result of their actions

indirectly from Coogan/ Morelli to which under the circumstances they don't deserve and/or are

not entitled.  They will be unjustly enriched at the expense of Coogan/ Morelli if they are allowed

to retain the same.

146.    Coogan/ Morelli are entitled to judgment against the various Co-Conspirators for the

amount of said monies as proven at trial.

147.    Coogan/ Morelli are entitled to cancellation of any and all agreements between them any

any of the Co-Conspirators.

### Fifth Claim for Relief – Breach of Contract and Indemnification

148.    Coogan/ Morelli reallege and incorporate herein by reference each and every paragraph in

this complaint.

149.    The actions complained of herein constitute a breach of the agreements between Coogan/

Morelli and the Steeds, Highland Development, Duchesne Land and their directly

affiliated entities.

150.    These entities should be ordered to indemnify Coogan/ Morelli from any liability to any

one related to the transactions and/or activities referred to herein.

151.    Coogan/ Morelli are entitled to judgment against each of them for Coogan/ Morelli's

actual and consequential damages flowing from these breaches of contract in an amount

35

to be determined at trial, but not less than $500,000; plus costs and attorneys fees.

### Sixth Claim for Relief – Civil Conspiracy

152.    Coogan/ Morelli reallege and incorporate herein by reference each and every paragraph in this complaint.

153.    The Co-Conspirators have joined together in the common purpose of defrauding Coogan/ Morelli and other buyers like them, their lenders and subcontractors, and obtaining property, services and/or money from Coogan/ Morelli and other buyers like them, their lenders and subcontractors, through false pretenses and misrepresentation as alleged herein.  The C o-Conspirators employed numerous illegal and tortious acts to accomplish these common ends as alleged herein, including without limitation fraud, misrepresentation, violation of consumer laws, breach of fiduciary duty, mail and wire fraud, money laundering and the like.

154.    The Co-Conspirators are liable to Coogan/ Morelli, and each of them, for actual and exemplary damages arising from this civil conspiracy in amounts to be determined at trial, but not less than $500,000 and $1,500,000, respectively.

### Seventh Claim for Relief  – Fraud Misrepresentation

155.    Coogan/ Morelli reallege and incorporate herein by reference each and every paragraph in this complaint.

36

156.    The Steeds, Highland Development, Duchesne Land and the entities directly affiliated

with them, represented and warranted that they were experienced builder developers, that

they would handle the financing, construction and sale of the home(s) on the lot(s) which

were purchased by Coogan/ Morelli, that the proceeds of the construction loan(s) would

be sufficient to build the home(s) on the lot(s), that lots and subdivisions were ready for

construction, and the like.  They also made all of the representations, warranties and

promises set forth in detail in this complaint.

157.    These entities knew or should have known that these representations and all of the other

ones alleged herein were false when they were made, or made them with reckless

disregard for their truthfulness.   Coogan/ Morelli did not know that these representations

of material fact were false, and reasonably relied upon them to their detriment.

158.    These entities knew that Coogan/ Morelli would rely upon these representations to

Coogan/ Morelli's detriment; and intended for them to rely upon them.

159.    Coogan/ Morelli' reliance upon these representations was reasonable.

160.    Coogan/ Morelli have been damaged as a result.

161.    Coogan/ Morelli are entitled to judgment against the Co-Conspirators, jointly and

severally, for their actual damages and punitive damages in amounts to be determined at

trial, but not less than $500,000 and $1,500,000, respectively.

Wherefore, Coogan/ Morelli pray for relief pursuant to their claims against the Co-

37

Conspirators as follows:

1.      For the following declaratory and related relief:

      a.      An order from this Court that all of the agreements entered into between Coogan/ Morelli and any of the Co-Conspirators are rescinded and null and void; and that all monies paid by Coogan/Morelli to any of the same must be returned immediately and bear interest at the legal rate from the date that Coogan/ Morelli paid them to the defendants until they are paid in full.

      b.      That the corporate veil should be pierced with respect to each of the corporate counterclaim and/or third party defendants.

2.      For judgment against each of the Co-Conspirators in the amount of Coogan/ Morelli's actual damages in an amount to be determined at trial, but not less than $500,000.

3.      For judgment against each of the Co-Conspirators for exemplary damages in an amount to be determined at trial, but not less than $1,500,000.

4.      For an award of costs and attorneys' fees.

5.      For indemnification with respect to any claims by any lender or anyone else associated with the purchase of the lot(s) and/or the construction of the home(s) against Coogan/ Morelli.

6.      For such other relief as the Court deems appropriate under the circumstances.

TRIAL BY JURY IS DEMANDED

Dated this _____ day of _____, 2010

**Steffensen ❖ Law ❖ Office**

Brian W. Steffensen